UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ERIC S. LOUKINAS,                                   Case No. 1:14-cv-930
          Plaintiff,                                Litkovitz, M.J.

     vs.

COMMISSIONER OF                           **ORDER**
SOCIAL SECURITY,
          Defendant.

Plaintiff Eric Loukinas brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3)

for judicial review of the final decision of the Commissioner of Social Security

("Commissioner") denying plaintiff's application for supplemental security income ("SSI").

This matter is before the Court on plaintiff's statement of errors (Doc. 15), the Commissioner's

response in opposition (Doc. 20), and plaintiff's reply memorandum (Doc. 23).

**I. Procedural Background**

Plaintiff protectively filed his application for SSI in April 2011, alleging disability since

June 1, 2005 due to post-traumatic stress disorder ("PTSD"), anxiety, panic attacks, depression,

and fight or flight syndrome. Plaintiff's application was denied initially and upon

reconsideration. Plaintiff, through counsel, requested and was granted a *de novo* hearing before

ALJ Gregory Kenyon. Plaintiff, plaintiff's mother Stephanie Morris, plaintiff's social worker

Susan Strassell, and a vocational expert ("VE") appeared and testified at the ALJ hearing. On

June 27, 2013, ALJ Kenyon issued a decision denying plaintiff's SSI application. The Appeals

Council denied plaintiff's request for review, making ALJ Kenyon's decision the final

administrative decision of the Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 416.920(a)(4)(i)-(v), 416.920(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.*; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the

2

claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999).

**B. The Administrative Law Judge's Findings**

The ALJ acknowledged that prior to the instant application, plaintiff had filed applications for disability insurance benefits and SSI on November 19, 2007, alleging disability beginning January 1, 2004. (Tr. 19). Following a hearing on the previous applications, ALJ Robert Flynn issued a decision dated May 19, 2010, finding plaintiff had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with the following non-exertional limitations: plaintiff could never climb ladders/ropes/scaffolds; must avoid all exposure to unprotected heights and use of moving machinery; could not do work requiring fine bilateral visual acuity; was limited to simple, routine, and repetitive tasks; must work in a low stress environment free of fast paced production requirements and involving only simple, work-related decisions and few, if any, work place changes; could have no contact with the public and only occasional and superficial contact with coworkers with no tandem tasks; and could have only occasional contact with supervisors. (Tr. 91). Upon consideration of the present application and all of the evidence of record, the ALJ in plaintiff's current claim, Gregory Kenyon, determined that new and material evidence did not exist to support a significant departure from ALJ Flynn's prior RFC finding, with the exception of eliminating the previous restriction against work involving fine bilateral visual acuity. (Tr. 19, citing *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997); Acquiescence Ruling 98-04(6); *Dennard v. Sec'y of Health & Human Servs.*, 907 F.2d 598 (6th Cir. 1990); Acquiescence Ruling 98-3(6)).[1]

---

[1] Under these provisions, Social Security claimants and the Commissioner are barred from re-litigating issues that have previously been determined unless certain conditions are met. *See* AR 98-4(6) ("When adjudicating a

3

ALJ Kenyon applied the sequential evaluation process and made the following findings of fact and conclusions of law:

1. The [plaintiff] has not engaged in substantial gainful activity since April 11, 2011, the application date (20 CFR 416.971 *et seq.*).

2. The [plaintiff] has the following severe impairments: post-concussive syndrome/a mild cognitive disorder, residuals of a prior facial fracture, chronic headaches, posttraumatic stress disorder/an anxiety disorder, depression, and a history of polysubstance abuse (20 CFR 416.920(c)).

3. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the ALJ finds that the [plaintiff] has the residual functional capacity to perform a full range of work at all exertional levels subject to the following limitations: the [plaintiff] can never climb ladders, ropes, or scaffolds; he cannot work around hazards such as unprotected heights or dangerous machinery; he is limited to performing unskilled, simple, repetitive tasks requiring no more than simple work-related decisions; he can tolerate occasional contact with co-workers and supervisors; he should never have contact with the public; he cannot perform jobs involving rapid production pace work or strict production quotas; and he is limited to performing jobs in a relatively static work environment in which there is very little, if any, change in the work routine from one day to the next.

5. The [plaintiff] is capable of performing past relevant work as an automobile detailer. This work does not require the performance of work-related activities precluded by the [plaintiff's] residual functional capacity (20 CFR 416.965).[2]

6. The [plaintiff] has not been under a disability, as defined in the Social Security Act, since April 11, 2011, the date the application was filed (20 CFR 416.920(f)).

(Tr. 21-34).

---

subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law. . . .").

[2] In the alternative, ALJ Kenyon found that plaintiff also would be able to perform representative unskilled occupations such as mail clerk (1,200 positions regionally and 60,000 positions nationally), cleaner (2,500 positions regionally and 136,000 positions nationally), and routing clerk (2,000 positions regionally and 100,000 positions nationally). (Tr. 33-34).

### C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. Medical Evidence

*Plaintiff's 2005 Head Injury*

ALJ Kenyon noted in his decision that many of plaintiff's medical conditions stem from a

head injury that he sustained in 2005. (*See* Tr. 25). In the prior decision, ALJ Flynn described

plaintiff's testimony "that on June 10, 2005, he walked into a bar and was punched and kicked in

the head. [Plaintiff] testified he suffered substantial head trauma, with injuries so bad he was

unrecognizable." (Tr. 91). At the hearing before ALJ Kenyon, plaintiff testified that as a result

of this assault, he underwent reconstructive facial surgery and muscle and jaw stretch. (Tr. 55-

56). Although medical records from the time of plaintiff's 2005 head injury are not before the

Court, many of the records that are before the Court refer to the 2005 assault, the resulting

surgery, and the impact of the assault and injuries on plaintiff's conditions.

*Hospital Records*

On October 2, 2010, plaintiff was transported by ambulance to the emergency department

after an assault at a bar. (Tr. 298). His past medical history was significant for (1) a plate to the

right cheek and mandible after the 2005 assault, and (2) hospitalization in 2009 for bipolar

disorder and schizophrenia. Plaintiff was taking the following antidepressants: Paxil,

Wellbutrin, and trazodone. Plaintiff indicated that he drank alcohol at least once a week, but he

denied any recreational drug use. (*Id.*).

In March 2011, plaintiff presented to the emergency department complaining of right

hand pain after punching a wall. (Tr. 302). Plaintiff reported occasional alcohol use. (Tr. 303).

*Lifepoint Solutions*

Dr. Natarajan, a psychiatrist, began treating plaintiff in January 2009. (*See* Tr. 356). In

January 2010, Dr. Natarajan noted that plaintiff was living with his mother and had no

independent source of income. (Tr. 398). Plaintiff's driver's license was suspended for failing

6

to pay child support, and he was unable to see his two children. In evaluating plaintiff's mental status, Dr. Natarajan noted that plaintiff was pleasant, his thought process was organized, and he had no signs of psychosis. Plaintiff's thought content and cognition were normal, and he denied suicidal or homicidal ideation. (*Id.*). Dr. Natarajan prescribed Paxil, Wellbutrin, and trazadone. (Tr. 399). Also in January 2010, plaintiff met with Rachael Brewer, a licensed social worker. (Tr. 397). Ms. Brewer noted that plaintiff's mood appeared sullen, but he denied depression and suicidal or homicidal ideation. (*Id.*).

At appointments in March and July 2010, Dr. Natarajan noted that plaintiff was pleasant with organized thought process and no signs of psychosis. (Tr. 387, 392). Plaintiff's thought content was significant for feeling overwhelmed, irritated, angry, depressed, and stressed out. (*Id.*). In March, plaintiff's affect was appropriate, but his mood was anxious. (Tr. 392). In July, his mood and affect appeared anxious and irritated. (Tr. 387). Plaintiff denied suicidal or homicidal ideation. (Tr. 387, 392). Plaintiff reported feeling irritated, angry, and depressed. (*Id.*). In July, Dr. Natarajan increased plaintiff's dosage of Paxil from 20 milligrams per day to 40 milligrams per day. (*See* Tr. 387, 393).

In August 2010, Dr. Natarajan noted that plaintiff continued to feel frustrated and irritable and had bouts of anger two to three times a week in which he threw things. (Tr. 385). In evaluating plaintiff's mental status, Dr. Natarajan noted that plaintiff was guardedly pleasant, his thought process was depressed and increasingly irritable and frustrated, and he appeared anxious. Dr. Natarajan noted that plaintiff's indigence and inability to see his children were major stressors for plaintiff. (*Id.*). Plaintiff's dosage of Wellbutrin was increased from 100 milligrams per day to 150 milligrams per day. (*See* Tr. 386, 393).

In October 2010, Dr. Natarajan noted that plaintiff was recently assaulted and sustained rib injuries. (Tr. 382). In evaluating plaintiff's mental status, Dr. Natarajan noted that plaintiff

was pleasant, his thought process was organized, and he had no signs of psychosis. His thought content was normal, his affect was appropriate, but his mood was mildly anxious. Dr. Natarajan noted that the increased dosage of Wellbutrin helped plaintiff's depression symptoms. However, plaintiff had noticed an increase in mood symptoms. Dr. Natarajan also noted that plaintiff was drinking less. (*Id.*). Also in October 2010, plaintiff met with Kelly Brown, a licensed social worker. (Tr. 381). Ms. Brown noted that plaintiff's mood/affect was flat, but that he was cooperative. Ms. Brown also noted plaintiff's report that he was recently "beaten up and jumped," and that he felt "very isolated at his house." (*Id.*). Ms. Brown also met with plaintiff in November and December 2010, made similar observations concerning his mood/affect and cooperation, and provided him with a referral to therapy. (Tr. 379-80).

In December 2010, Dr. Natarajan and plaintiff discussed slowly weaning plaintiff off Paxil. (Tr. 377). In evaluating plaintiff's mental status at appointments in December 2010 and February 2011, Dr. Natarajan indicated that plaintiff's thought process was organized, his affect was appropriate, and his mood was depressed and anxious. (Tr. 373, 377). In January 2011, Ms. Brown noted that plaintiff was cooperative. (Tr. 376). Plaintiff reported that he had difficulty following directions, performing simple tasks, and concentrating. (*Id.*).

Plaintiff had his first therapy session with Peter Mesrin, a professional clinical counselor, in February 2011. (Tr. 372). Mr. Mesrin noted that while plaintiff was cooperative, his mood was depressed and his affect was constricted. Mr. Mesrin noted that they discussed plaintiff's decreased functioning over the past five years since he was attacked. They processed plaintiff's "mood swings," i.e., "angry outbursts that happen" on a daily basis during which plaintiff "breaks things in the apartment then walks down the street yelling [and] looking for someone to fight." (*Id.*). Mr. Mesrin noted that plaintiff was experiencing one to two panic attacks a day, including a panic attack in the middle of the night that felt like a heart attack. (*Id.*).

8

On March 4, 2011, Mr. Mesrin noted that plaintiff was agitated and had been feeling that way all day. (Tr. 371). They discussed incidents of hearing voices. (*Id.*). Plaintiff met with social worker Michaelle Garrison on March 30, 2011. (*See* Tr. 370). Ms. Garrison noted that plaintiff's mood/affect was blunt and that he reported symptoms of confusion. (*Id.*).

In April 2011, Ms. Garrison noted that plaintiff's mood/affect was blunt and that he reported symptoms of depression and paranoia. (Tr. 367). They discussed plaintiff's anger issues, poor judgment concerning choice of friends, and abuse as a child. (*Id.*). Also in April 2011, Dr. Natarajan noted that plaintiff was still feeling irritated and anxious. (Tr. 364). Plaintiff reported that he did not go out much, "except fishing which he enjoys." (*Id.*). Dr. Natarajan noted that plaintiff's mood was still depressed. Plaintiff believed his medications were not helping, but he was still taking them. (*Id.*). Also in April 2011, Mr. Mesrin noted: "[Plaintiff] had a recent blackout where he punched in a window and frightened brother. [Plaintiff] expressed hopelessness of situation and SSI claim. [Plaintiff] discussed sexual abuse by step-father, step-brother, and step-uncles when he was seven years old. [Plaintiff] has been having flashbacks, trigger[ing] anger." (Tr. 363).

In June 2011, Mr. Mesrin noted that plaintiff experienced suicidal ideation after his ex-girlfriend would not let him talk to their children when he had to cancel a visit. (Tr. 361). Plaintiff had thoughts of drowning himself in the river, but did not follow through on these thoughts due to the effect on his family after his last suicide attempt. Plaintiff was hopeless because his SSI claim was denied again and he could not get medical coverage. Mr. Mesrin and plaintiff also discussed increases in plaintiff's anger and anxiety. (*Id.*).

Mr. Mesrin completed a daily activities questionnaire in June 2011. (Tr. 359-60). Mr. Mesrin noted that plaintiff cannot be in public, but is okay if he has his own space. (Tr. 359). Mr. Mesrin indicated that plaintiff's relationships with family, friends, and neighbors were "very

poor." (*Id.*). Specifically, Mr. Mesrin noted: "[Plaintiff's] [m]other only sleeps in apartment to avoid [plaintiff]. [Plaintiff] has no contact with his children or past friends. [Plaintiff] fights with neighbors when they confront him." (*Id.*). Plaintiff visits with his family two to three times per year, but never visits friends. During visits with family, plaintiff and his brother go fishing, but typically end up fighting. During past regular work, plaintiff "got along well with co-workers and supervisors, and had no problems," but during attempts to return to work, plaintiff "was terminated for his attitude and angry outbursts." (*Id.*). Plaintiff was fired four times "since the accident" and had "lost [his] temper on job." (*Id.*). Mr. Mesrin opined: "[Plaintiff] has constant headaches. Concentration and memory are impaired. [Plaintiff's] anger is unpredictable [and he] reacts vol[a]tile[l]y at times, feels threatened." (*Id.*). Mr. Mesrin indicated that plaintiff was able to prepare food, do household chores, and attend to personal hygiene. (Tr. 360). However, plaintiff was unable to go shopping because he was "unable to go out in public [and] cannot tolerate waiting in lines [or] having people behind him." (*Id.*). Plaintiff did not have a driver's license and was unable to "tolerate public transportation." (*Id.*). His only hobby was fishing "alone at night when others are not around." (*Id.*). Mr. Mesrin indicated that plaintiff took his medications, but his psychiatrist was "unable to prescribe different medications that may be more effective due to the cost." (*Id.*). Mr. Mesrin noted that plaintiff "has difficulty engaging with new providers and is hostile until comfortable." (*Id.*).

In a June 2011 mental status questionnaire, Dr. Natarajan indicated that plaintiff dresses casually and "appears suspicious looking around [and] watching others." (Tr. 356). Plaintiff's speech was within normal range, but his mood was depressed and his affect was anxious. (*Id.*). Dr. Natarajan indicated that plaintiff regularly experienced panic attacks, was hyper-vigilant in social settings, and frequently worried about his health and situation. Plaintiff was not psychotic, but he complained of racing thoughts. As to plaintiff's cognitive functioning, Dr. Natarajan

10

noted: "Poor concentration – frequently distracted [and] not able to focus on tasks or complete them. Short term memory impaired. Long-term seems intact." (*Id.*). As to plaintiff's insight and judgment, Dr. Natarajan noted: "[Plaintiff] reports episode of rage with no precipitant. [Plaintiff] isolates due to unpredictable response to others. Frequently fights in public. Often has the urge to leave mother's apartment to find someone to fight. Does not drink due to effect on anger." (*Id.*). Plaintiff's medical history was significant for traumatic brain injury, but he was not currently receiving medical treatment due to his lack of insurance. (Tr. 357). Dr. Natarajan diagnosed plaintiff with recurrent major depressive disorder and chronic PTSD. He also assessed plaintiff's functional capacity from a mental health standpoint. As to plaintiff's ability to remember, understand, and follow directions, Dr. Natarajan opined that plaintiff "understands, but cannot remember, gets distracted before he can follow through." (*Id.*). Plaintiff's ability to maintain attention was "[e]xtremely impaired cannot focus for a full minute." (*Id.*). Concerning plaintiff's ability to sustain concentration, persist at tasks, and complete them in a timely fashion, Dr. Natarajan opined that plaintiff "gets distracted, and starts doing other things, does not complete tasks." (*Id.*). As to plaintiff's ability to interact socially, Dr. Natarajan opined that plaintiff was extremely anxious and hyper-vigilant around others; plaintiff's anxiety and hyper-vigilance were "[t]riggered by loud noises, yelling, and crowds, [and he] react[ed] aggressively." (*Id.*). Dr. Natarajan indicated that plaintiff had not been able to adapt during the six years since his traumatic brain injury. As to plaintiff's ability to react to the pressures involved in simple, routine, and repetitive tasks, Dr. Natarajan opined: "[Plaintiff] does not deal with pressures or stress well at all. Reacts aggressively. [Plaintiff] has frequent migraines and 'pressure headaches.'" (*Id.*).

In April 2012, Lifepoint Solutions involuntarily discharged plaintiff as a client due to non-participation because plaintiff "canceled last 3 [doctor] visits and missed [individual service

plan appointment]. Little progress was made." (*See* Tr. 477-78). Plaintiff was assigned a GAF score of 49 at the time of discharge.[3] (Tr. 477).

In May 2012, Stephanie Markle, a licensed social worker, reassessed plaintiff and reopened his case management services. (*See* Tr. 454, 461-75). Plaintiff reported that his meaningful activities included pacing at night, fishing, and sleeping. (Tr. 462). Plaintiff reported that he could not be around groups of people and was "really paranoid." (Tr. 463). Plaintiff reported drinking alcohol once every few months. (Tr. 466). He indicated that he had not used marijuana since 2011. (*Id.*). In evaluating plaintiff's mental status, Ms. Markle indicated that plaintiff did not report any delusions or hallucinations. (Tr. 469). Plaintiff's thought process was concrete, his mood was depressed, his affect was constricted, and his behavior was cooperative. (Tr. 469-70). Plaintiff's ability to abstract was impaired, and his insight and judgment were poor. (Tr. 470). He was estimated to be of average intelligence. (*Id.*). Plaintiff attempted suicide in 2009 by taking all his medicines and was hospitalized. (*Id.*). Plaintiff reported that he had been in more than 100 physical fights. (Tr. 471). Plaintiff was diagnosed with moderate and recurrent major depressive disorder, panic disorder with agoraphobia, PTSD, cannabis abuse in full sustained remission, and a history of seizures, head injury, and headaches. (Tr. 473). Ms. Markle assigned plaintiff a GAF score of 61.[4] (Tr. 474).

---

[3] A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." *Id.* The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 34. Individuals with GAF scores of 41 to 50 have "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.*

[4] Individuals with GAF scores of 61 to 70 have "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 34.

In July 2012, Susan Strassell, a licensed social worker, wrote a letter on plaintiff's behalf. (Tr. 498-99). Ms. Strassell indicated that she had met with plaintiff twice in the last month. (Tr. 498). Ms. Strassell opined:

> [Plaintiff] has numerous medical issues daily (i.e., daily headaches, "fire and pain shooting through his face daily"). He isolates himself, has diminished interest in pleasure or almost all activities. Has a great sleep disturbance, decreased energy, a lot of feelings of guilt and worthlessness, very paranoid thinking and difficulties with concentration. [Plaintiff] has a marked inability to complete a normal work day or work week without interruptions from his mental disorder. His diagnosis is Major Depression Recurrent and Severe with Most Recent Ep[is]ode of Depression, and Panic Disorder with Agoraphobia. Two years ago [he] was hospitalized at Mercy Hospital Clermont under Dr. Monica Kennedy because of a suicide attempt. His past includes a[n] extensive criminal history dating from age 15. Has a history of marijuana use and abuse which was his drug of choice. He has been sober from marijuana for over 13 months as was his lifestyle choice.
>
> . . .
>
> [Plaintiff] can not work anytime in the future or near future. And will need to be readdressed yearly at best.

(Tr. 498-99).

On October 10, 2012, Amy Perry, a certified nurse practitioner, completed a psychiatric intake evaluation of plaintiff. (Tr. 447-48). In evaluating plaintiff's mental status, Ms. Perry indicated that plaintiff's mood was "crappy," his affect was flat, the tone of his speech varied, but his rate of speech was normal. (Tr. 448). Plaintiff's thinking was slowed, but logical. He had impaired cognitive ability, poor attention span, and poor focus. Plaintiff was irritable, but he denied suicidal or homicidal ideation. Ms. Perry diagnosed plaintiff with a mood disorder, and a panic disorder with agoraphobia. Ms. Perry assigned plaintiff a GAF score of 35.[5] In addition to Wellbutrin and trazodone, Ms. Perry prescribed Depakote for mood stability and anger issues.

---

[5] Individuals with GAF scores of 31 to 40 have "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." DSM-IV at 34.

Ms. Perry planned to refer plaintiff to a neurologist for a consultation and MRI of the brain. (*Id.*).

At an appointment with Ms. Perry on October 26, 2012, plaintiff reported that his mood was "crappy" and he was only sleeping two to three hours per night. (Tr. 445). Plaintiff reported that he was unable to pay attention and that he was hearing voices, but thought they were his mother. In evaluating plaintiff's mental status, Ms. Perry indicated that plaintiff's speech was low and slow, his thought process was slow at times, and it was hard for him to express himself at times. Plaintiff was anxious and was positive for auditory hallucinations. Plaintiff's mood was "irritable, crappy," and his affect was depressed and sad. (*Id.*). Plaintiff denied having a plan or thoughts for suicide, but he "thinks about dying at [times]." (*Id.*). Plaintiff's cognition was below average with poor memory and focus. Ms. Perry noted that plaintiff was having panic attacks three to four times a day that felt like having a heart attack and being unable to breathe. (*Id.*).

In January 2013, Dr. Cheng, a psychiatrist, indicated that plaintiff's thought process was organized and logical, his thought content was negative for delusion/obsession but positive for intrusive thoughts, his mood was depressed, and his affect was mildly restricted/constricted. (Tr. 439). Plaintiff's perception did not include any hallucinations, he denied suicidal or homicidal ideation, and his behavior was cooperative and pleasant. (*Id.*). Dr. Cheng discontinued Risperdal (an antipsychotic medication) and indicated that plaintiff would be tapered off Wellbutrin. (Tr. 440). Dr. Cheng prescribed Zoloft (an antidepressant) and Klonopin (a benzodiazepine used to treat anxiety and panic disorders). In discontinuing Risperdal and Wellbutrin, Dr. Cheng indicated that they had "insufficient benefit/efficacy in alleviating" plaintiff's symptoms. (*Id.*). Dr. Cheng indicated that the overall assessment of plaintiff's condition was worse. (*Id.*).

14

In February 2013, Dr. Cheng indicated that plaintiff "[p]resented with lessening in clinical depressive mood and neurovegetative symptoms." (Tr. 437). However, plaintiff still had "prominent psychic/clinical PTSD-like symptoms (nightmares, flashbacks/intrusive thoughts, hyperarousal/stimuli avoidance)." (*Id.*). In evaluating plaintiff's mental status, Dr. Cheng indicated that plaintiff's thought process was organized and coherent, his thought content was positive for intrusive thoughts, his mood was depressed, and his affect was restricted and constricted. Plaintiff's perception did not include any hallucinations, he denied suicidal or homicidal ideation, and his behavior was cooperative and pleasant. (*Id.*). Dr. Cheng increased plaintiff's dosage of Zoloft from 100 mg to 200 milligrams per day. (*See* Tr. 438, 440). Dr. Cheng continued plaintiff on trazodone and Klonopin. (Tr. 438). In explaining the increased dosage of Zoloft, Dr. Cheng noted: "Insufficient benefit/efficacy in alleviating symptoms." (*Id.*). Dr. Cheng indicated that the overall assessment of plaintiff's condition was the same. (*Id.*).

### Dr. Hyatt

In February 2013, plaintiff was examined by clinical neuropsychologist Thomas Hyatt, Psy.D., upon referral by the Department of Disability Determination. (Tr. 418-24). Dr. Hyatt noted that plaintiff's history was significant for repeated childhood sexual abuse beginning at age 7 and "several run-ins with the law beginning at age 16," including serving 1.5 years in prison for safe-cracking and theft. (Tr. 418). Plaintiff indicated that he dropped out of school in the ninth grade because he "was getting beat up all the time." (*Id.*). Plaintiff indicated that he drank "occasionally" but denied the use of any illegal drugs. (Tr. 419). Dr. Hyatt noted that plaintiff's medical records showed that plaintiff "required a plate to the right cheek and mandible as a result of th[e] 2005 assault." (*Id.*). Dr. Hyatt opined that the symptoms noted in Mr. Mesrin's daily activities questionnaire in June 2011—constant headaches, difficulties with concentration and

15

memory, anger issues, and "volatile and unpredictable" moods—were "consistent with the after-effects of traumatic brain injury." (Tr. 420).

Plaintiff's mother informed Dr. Hyatt that plaintiff "can manage his own hygiene and grooming but needs a constant routine and has difficulties with judgment and/or putting together complex actions." (*Id.*). Plaintiff indicated that he sometimes was able to microwave prepared foods, vacuum around the apartment, and do laundry. Plaintiff's mother observed "he had some difficulties managing his medications and a great deal of difficulty managing money." (*Id.*). Plaintiff indicated he had no friends and that "his recreation involved watching TV, drawing, or going fishing." (*Id.*).

In evaluating plaintiff's mental status, Dr. Hyatt noted that plaintiff's eye contact was "rather intense." (*Id.*). Plaintiff "was subdued but cooperative and appeared to put forth a reasonable effort when presented with various cognitive tasks." (*Id.*). Plaintiff was "rather taciturn and spoke in short sentences and generally only in response to questions." (Tr. 421). Dr. Hyatt noted that plaintiff appeared "edgy" during the interview and that "his gaze was initially rather intense; almost challenging." (*Id.*). Plaintiff's affect was flat and humorless. Plaintiff endorsed multiple symptoms of "significant depression including feeling worthless, hopeless, helpless, dissatisfied with life, and feeling downhearted and blue." (*Id.*). Plaintiff indicated that "he frequently felt bored and tended to be restless. . . . with difficulties getting to sleep or remaining asleep." (*Id.*).

As to cognitive functioning, Dr. Hyatt noted that plaintiff "proved able to attend to a relatively fast-paced diligence task and attend to and repeat up to 5 digits in the order of their presentation." (*Id.*). Plaintiff scored in the 55th percentile on the Wechsler Test of Adult Reading. (Tr. 422). Plaintiff received a full-scale IQ score of 77 on the Wechsler Adult Intelligence Scale, Fourth Edition. This score "ranked in the 6th percentile and in the Borderline

range." (*Id.*). Because of plaintiff's reported history of head injury, Dr. Hyatt administered the Montreal Cognitive Assessment, "a screening test sensitive to the organic integrity of the brain." (*Id.*). Plaintiff's performance on this test suggested cognitive impairment. Plaintiff's short-term memory "appeared impaired as he was unable to recall even one of five words that had previously been twice presented and repeated by the [plaintiff]." (*Id.*). Further, after a paragraph-long story was presented to him, plaintiff "was only able to grasp a few random words but not the gist or general meaning of the story." (*Id.*). Dr. Hyatt noted that "[r]epetition did not seem to help much and after a brief delay he was unable to recall any significant details." (*Id.*). Dr. Hyatt noted indicators of poor insight and judgment. (*See id.*).

Based on plaintiff's score on the Wechsler Test of Adult Reading, Dr. Hyatt concluded that plaintiff's level of intellectual functioning might have been higher before his head injury. (Tr. 423). However, plaintiff's "emotional issues and psychosocial maladjustment . . . likely . . . occurred much earlier and, according to the claimant's history most likely stem from his being sexually abused as a child." (*Id.*). Dr. Hyatt concluded that plaintiff's mental condition "appears to be a rather complex case with multi-factorial etiologies." (*Id.*). Dr. Hyatt diagnosed plaintiff with chronic and markedly severe PTSD, a markedly severe mood disorder with psychotic features, and a mildly impaired cognitive disorder. Dr. Hyatt did not make a formal diagnosis on Axis II but noted paranoid personality traits. Dr. Hyatt assigned a GAF score of 35. (*Id.*).

Dr. Hyatt opined that plaintiff was able to understand and carry out one- or two-step instructions that did not involve mathematical calculations. However, Dr. Hyatt noted that plaintiff's responses were often inaccurate and his "intellectual functioning (I.Q.) was estimated to be in the borderline range." (*Id.*). Dr. Hyatt opined that plaintiff's abilities to maintain attention and concentration were mildly impaired, but his short term memory was markedly impaired "as he had extreme difficulties remembering new information after even a brief delay."

17

(*Id.*). Plaintiff "was able to attend to conversations but seemed limited in terms of expressing his thoughts and feelings." (*Id.*). While plaintiff was cooperative during the interview, "he was initially quite tense and ill-at-ease," and "his history and personality characteristics suggest an individual who is suspicious, hostile, and who very likely frequently misinterprets social stimuli." (*Id.*). Dr. Hyatt noted that plaintiff "sometimes goes looking for someone to fight with." (*Id.*). As to how plaintiff might respond to pressures in a work setting, Dr. Hyatt noted that plaintiff "tolerated this examination fairly well." (Tr. 424). However, Dr. Hyatt opined that plaintiff "appears to be an individual with impaired social skills who tends to get easily upset around people." (*Id.*). Further, plaintiff "seems to have only a tenuous grip on reality and/or his temper," as evidenced by his "history of quick mood changes and an easy anger." (*Id.*).

Dr. Hyatt also completed a medical source statement of ability to do work-related activities. (Tr. 426-28). Concerning plaintiff's ability to understand, remember, and carry out instructions, Dr. Hyatt opined that plaintiff was mildly limited in his ability to understand and remember simple instructions, moderately limited in his ability to carry out simple instructions, and markedly limited in his ability to (1) make judgments on simple work-related decisions, (2) understand and remember complex instructions, (3) carry out complex instructions, and (4) make judgments on complex work-related decisions. (Tr. 426). Concerning plaintiff's ability to act appropriately in a work setting, Dr. Hyatt opined that plaintiff is moderately limited in his ability to interact appropriately with co-workers and markedly limited in his ability to (1) interact appropriately with the public, (2) interact appropriately with supervisors, and (3) respond appropriately to usual work situations and to changes in a routine work setting. (Tr. 427). Dr. Hyatt indicated that this assessment was based on plaintiff's "history of very poor mood regulation and also paranoid delusions." (*Id.*). Dr. Hyatt opined that plaintiff's social functioning was also markedly impaired. Further, Dr. Hyatt opined that plaintiff has a cognitive

impairment based on the results of plaintiff's IQ testing. (*Id.*). Dr. Hyatt did not indicate that plaintiff currently suffered from substance or alcohol abuse and therefore he did not indicate his opinion would change if plaintiff "was totally abstinent from alcohol and/or substance use/abuse." (*See id.*).

*Non-examining State Consultants*

In July 2011, Karla Voyten, Ph.D., adopted the mental RFC from ALJ Flynn's May 2010 decision. (*See* Tr. 113). Dr. Voyten found that plaintiff's conditions and allegations were the same as before. (*Id.*). On reconsideration, Caroline Lewin, Ph.D., affirmed the mental RFC as written. (*See* Tr. 125).

*Witnesses at Plaintiff's Hearing Before ALJ Kenyon*

In April 2013, Stephanie Morris, plaintiff's mother, testified that plaintiff stays up all night pacing. (Tr. 62-63). As to plaintiff's hyper-vigilance, Ms. Morris stated, "He's scanning, he's on the prowl, he's, so many people feel threatened just by him look, you know, his look. The doctors call it fight or flight, is what they call it." (Tr. 63). Before the 2005 assault, plaintiff "was the one that made everybody laugh, and [was] fun-loving, and [was] the big jokester." (Tr. 64). As to the changes in plaintiff after the assault, Ms. Morris testified:

> I don't see that person anymore. It's a lot of anger. Just fearful all the time. For a long time I tried to get his friends to come out, and they would at first, and then he's just become so paranoid that they don't want to be around him anymore. Everybody's talking about him, or everybody's out to get him, or—but he thinks they think they're better.

(*Id.*). Ms. Morris testified that plaintiff has nightmares and jumps up and runs outside in the middle of the night. (Tr. 68).

Ms. Strassell, plaintiff's social worker, testified that in January 2013 plaintiff had a CT scan of the head, which was normal. (Tr. 70). She was trying to have plaintiff seen by a neurologist but University Hospital would not see an indigent client from Clermont County, and

the distance to Ohio State University made a referral there problematic. (*See id.*). Ms. Strassell agreed with the validity of plaintiff's GAF scores of 35 and 49. (Tr. 71). Ms. Strassell indicated that she saw plaintiff on a consistent basis, typically at his residence. (*Id.*). Ms. Strassell "absolutely" agreed that plaintiff's ability to make judgments on simple work-related decisions is "severely limited." (Tr. 72). She did not believe that plaintiff could work at all. (*See* Tr. 72-73).

### E. Specific Errors

On appeal, plaintiff contends that: (1) ALJ Kenyon failed to properly weigh the opinions of Dr. Hyatt, the consultative examiner; Drs. Cheng and Natarajan, the treating psychiatrists; and Ms. Strassell, plaintiff's social worker; (2) ALJ Kenyon's determination of the credibility of plaintiff and his mother was contrary to law and not supported by substantial evidence; and (3) ALJ Kenyon failed to properly assess plaintiff's RFC.[6] (Doc. 15 at 10-36).[7]

### 1. ALJ Kenyon's assessment of the medical opinion evidence is not supported by substantial evidence.

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530-31 (6th Cir. 1997). *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."). "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or

---

[6] In the interest of clarity, plaintiff's assignments of error have been consolidated and renumbered.

[7] Citations to this document refer to the page numbers provided by CM/ECF.

who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

"Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)). *See also Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). If the ALJ declines to give a treating source's opinion controlling weight, the ALJ must balance the factors set forth in 20 C.F.R. § 416.927(c)(2)-(6) in determining what weight to give the opinion. *See Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544. These factors include the length, nature and extent of the treatment relationship and the frequency of examination. 20 C.F.R. § 416.927(c)(2)(i)-(ii); *Wilson*, 378 F.3d at 544. In addition, the ALJ must consider the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. § 416.927(c)(3)-(6); *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.

"Importantly, the Commissioner imposes on its decision makers a clear duty to 'always give good reasons in [the] notice of determination or decision for the weight [given a] treating source's opinion.'" *Cole*, 661 F.3d at 937 (citation omitted). *See also Wilson*, 378 F.3d at 544 (ALJ must give "good reasons" for the ultimate weight afforded the treating physician opinion). Those reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937 (citing SSR 96-2p, 1996 WL 374188 (1996)). This procedural requirement "ensures that the ALJ applies the

treating physician rule and permits meaningful review of the ALJ's application of the rule." *Gayheart*, 710 F.3d at 376 (quoting *Wilson*, 378 F.3d at 544).

Dr. Natarajan, plaintiff's treating psychiatrist, oversaw plaintiff's treatment at Lifepoint Solutions from January 27, 2009 through June 16, 2011. (Tr. 356). Dr. Natarajan noted plaintiff had previously sustained a traumatic brain injury and he diagnosed plaintiff with major depressive disorder, recurrent, and posttraumatic stress disorder, chronic. (Tr. 357). As to plaintiff's functional abilities, Dr. Natarajan opined that plaintiff "understands, but cannot remember" and "gets distracted before he can follow through"; plaintiff's ability to maintain attention was "extremely impaired" and he could not "focus for a full minute"; plaintiff's ability to sustain concentration, persist at tasks, and complete them in a timely fashion were limited in that plaintiff "gets distracted, and starts doing other things, [and he] does not complete tasks"; plaintiff's ability to interact socially was limited by his extreme anxiety and hyper-vigilance, which were triggered by loud noises, yelling, and crowds and caused him to act aggressively; and his adaptation was limited in that plaintiff had not been able to adapt during the six years since his traumatic brain injury. (Tr. 357). Dr. Natarajan opined that plaintiff's ability to react to the pressures involved in simple, routine, and repetitive tasks was also limited in that he "does not deal with pressures or stress well at all," he "[r]eacts aggressively," and he "has frequent migraines and 'pressure headaches.'" (*Id.*).

ALJ Kenyon gave "limited weight" to Dr. Natarajan's opinion for the following reasons:

With respect to the questionnaire signed by Dr. Natarajan, it appears that he did not complete the questionnaire personally, which slightly reduces the weight offered to the opinions. Further, as noted above, Dr. Natarajan appears to have been unaware that [plaintiff] was still drinking, despite the reported effects of alcohol on his functioning. Most significantly, the statements within the questionnaire are not supported by Dr. Natarajan's progress notes or the other medical evidence. For example, the questionnaire asserts that [plaintiff's] ability to maintain attention is so impaired that he is unable to focus for even a full minute. However, [plaintiff] has also been described as able to be engaged and

> his ability to complete extensive clinical and formal testing when examined by
> Dr. Hyatt indicates the ability to focus for more than one minute.

(Tr. 31).

In relevant part, plaintiff argues that ALJ Kenyon failed to properly weigh the regulatory factors in 20 C.F.R. § 416.927(c) before rejecting the medical opinions, including that of Dr. Natarajan. (*See* Doc. 15 at 21-22). Plaintiff argues that ALJ Kenyon improperly cherry-picked record evidence to discredit the opinions of Drs. Natarajan, Cheng, and Hyatt. (*Id.* at 22). Plaintiff contends that the medical records from Lifepoint Solutions, especially the treatment notes and opinion of Dr. Natarajan, are consistent with Dr. Hyatt's opinion. (*Id.* at 13). Plaintiff argues that even if Dr. Natarajan and Dr. Cheng relied on plaintiff's self-reported symptoms, that reliance is not a basis for rejecting their opinions because mental treatment depends on a patient's subjective presentation. (*Id.* at 20).

ALJ Kenyon's decision to give limited weight to Dr. Natarajan's opinion is without substantial support in the record and his stated justifications for discounting the treating psychiatrist's medical opinion are not "good reasons" supported by the record. *See Cole,* 661 F.3d at 937. First, Dr. Natarajan's endorsement of the mental status questionnaire rendered it an opinion of a treating physician, even if Dr. Natarajan did not personally complete the form. *See Fairchild v. Colvin,* 14 F. Supp.3d 908, 917 n.5 (S.D. Ohio 2014) (finding that because a treating psychiatrist "signed off" on statements given by a licensed social worker, those statements were considered the opinion of the treating psychiatrist); *Goins v. Astrue,* No. 4:07-cv-84, 2008 WL 4066095, at *3 (W.D. Ky. Aug. 28, 2008) (finding the ALJ erred by failing to treat a medical statement with deference when the claimant's therapist's diagnosis was signed by claimant's treating psychiatrist). Accordingly, the fact that Dr. Natarajan's opinion was contained on a

23

form he may not have generated is not a "good reason" for discounting his opinion. *See Blakley*, 581 F.3d at 406-07.

Second, the evidence of record does not substantially support ALJ Kenyon's speculation that Dr. Natarajan's opinion would have changed with more information about plaintiff's alleged use of alcohol. Although the record reflects some alcohol use by plaintiff, no treating source has identified substance or alcohol abuse as an ongoing diagnosis or problem. In addition, Dr. Hyatt, the consultative examiner, did not diagnose substance or alcohol abuse and, as a result, he did not indicate his opinions would change if plaintiff "was totally abstinent from alcohol and/or substance use/abuse." (*See* Tr. 427).

The final reason ALJ Kenyon gave for assigning limited weight to Dr. Natarajan's opinion was that "the statements within the questionnaire are not supported by Dr. Natarajan's progress notes or the other medical evidence." (Tr. 31). The only example cited by the ALJ was Dr. Natarajan's opinion that plaintiff was unable to maintain attention or focus for even a full minute. (*See id.*). The ALJ asserted that plaintiff's completion of testing with Dr. Hyatt was inconsistent with Dr. Natarajan's opinion because the testing "indicates the ability to focus for more than one minute." (Tr. 31). However, ALJ Kenyon's opinion about the level of attention and concentration needed to complete psychological testing in a one-on-one session with a trained psychologist constitutes a medical judgment that the ALJ is not qualified to make, especially as Dr. Natarajan's opinion is consistent with the record. *See Meece v. Barnhart*, 192 F. App'x 456, 465 (6th Cir. 2006) (holding that an ALJ "may not substitute his own medical judgment for that of the treating physician where the opinion of the treating physician is supported by the medical evidence"). *See also Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) (stating "ALJs must not succumb to the temptation to play doctor and make their own independent medical findings"). Moreover, despite plaintiff's ability to carry out one or two-step

24

instructions during testing with Dr. Hyatt, his responses were "often inaccurate." (Tr. 423). In

any event, the treating and examining medical sources consistently noted plaintiff's problems

with attention and concentration and support Dr. Natarajan's opinion. For example, in January

2011, Ms. Brown, plaintiff's social worker, noted his difficulties with concentration and

following simple tasks. (Tr. 376). In June 2011, Mr. Mesrin, plaintiff's therapist, opined that

plaintiff's concentration and memory are impaired. (Tr. 359). In July 2012, Ms. Strassell,

plaintiff's social worker, opined that plaintiff has difficulties with concentration. (Tr. 498). On

October 10, 2012, Ms. Perry, plaintiff's psychiatric nurse practitioner, evaluated plaintiff's

mental status and noted that he had slowed thinking, impaired cognitive ability, poor attention

span, and poor focus. (Tr. 448). Ms. Perry continued to note below average cognition with poor

memory and focus on October 26, 2012. (Tr. 445). Dr. Hyatt opined that plaintiff's reported

difficulties with concentration were consistent with plaintiff's history of traumatic brain injury.

(Tr. 420). While Dr. Hyatt rated plaintiff's abilities to maintain attention and concentration as

mildly impaired, he noted that plaintiff's short term memory was markedly impaired as he had

extreme difficulties remembering new information after even a brief delay. (Tr. 423). As the

medical evidence is consistent with Dr. Natarajan's opinion on plaintiff's problems with

attention and focus, the ALJ's justification does not constitute a "good reason" for discounting

Dr. Natarajan's opinion. *See Gayheart*, 710 F.3d at 376; *Cole*, 661 F.3d at 937; *Wilson*, 378 F.3d

at 544.

In addition, the ALJ failed to give appropriate consideration to the regulatory factors in

assigning weight to Dr. Natarajan's opinion. *See* 20 C.F.R. § 416.927(c)(2)-(6). Specifically,

ALJ Kenyon failed to acknowledge that Dr. Natarajan had an over two-year treating relationship

with plaintiff with frequent examinations at the time he rendered his opinion. (*See* Tr. 356, 364,

373, 377, 382, 385, 387, 392, 398); 20 C.F.R. § 416.927(c)(2)(i)-(ii); *Rogers*, 486 F.3d at 244;

*Wilson*, 378 F.3d at 544. Further, Dr. Natarajan is a specialist in psychiatry. *See* 20 C.F.R. § 416.927(5). Moreover, Dr. Natarajan's opinions are consistent with the medical record. *See* 20 C.F.R. § 416.927(3)-(4). First, Dr. Natarajan opined that while plaintiff could understand directions, he could not remember or follow through with them and was unable to complete tasks. (Tr. 357). This is consistent with Ms. Brown's January 2011 note that plaintiff had difficulty performing simple tasks (Tr. 376) and Ms. Strassell's July 2012 opinion that plaintiff "has a marked inability to complete a normal work day or work week without interruptions from his mental disorder." (Tr. 498). Dr. Hyatt likewise opined that plaintiff's short term memory was markedly impaired "as he had extreme difficulties remembering new information after even a brief delay." (Tr. 423). Further, Dr. Hyatt opined that plaintiff was moderately limited in his ability to carry out simple instructions and markedly limited in his ability to carry out complex instructions. (Tr. 426).

Second, Dr. Natarajan opined that plaintiff's ability to interact socially was compromised by his extreme anxiety, hyper-vigilance, and aggression. (Tr. 357). This aggression was triggered by loud noises, yelling, and crowds. (*Id.*). Further, Dr. Natarajan opined that plaintiff could not handle the pressures involved in simple, routine, and repetitive tasks because he "does not deal with pressures or stress well at all" and "[r]eacts aggressively." (*Id.*). Consistent with these opinions, Dr. Natarajan repeatedly noted plaintiff's anxiety, irritability, and anger on numerous occasions. (*See* Tr. 364, 373, 382, 385, 387, 392). Mr. Mesrin noted plaintiff's "angry outbursts that happen" on a daily basis during which plaintiff "breaks things in the apartment then walks down the street yelling [and] looking for someone to fight." (Tr. 372). Mr. Mesrin also noted that plaintiff experienced one to two panic attacks a day. (*Id.*). At another therapy session, Mr. Mesrin noted that plaintiff "had a recent blackout where he punched in a window and frightened [his] brother." (Tr. 363). Mr. Mesrin also noted that flashbacks to

childhood sexual abuse were triggering anger. (*Id.*). In a daily activities questionnaire, Mr. Mesrin opined that plaintiff acted aggressively to others, and was terminated from jobs for "angry outbursts" and losing his temper. (Tr. 359). Mr. Mesrin opined that plaintiff's "anger is unpredictable [and he] reacts vol[a]tile[l]y at times, feels threatened." (*Id.*). Ms. Perry noted that plaintiff was irritable and anxious. (Tr. 445, 448). She diagnosed a panic disorder with agoraphobia. (Tr. 448). She also noted that plaintiff was having three to four panic attacks per day. (Tr. 445). Dr. Hyatt opined that plaintiff's anger issues and volatile moods were consistent with his history of traumatic brain injury. (Tr. 420). Dr. Hyatt concluded that plaintiff's "history and personality characteristics suggest an individual who is suspicious, hostile, and who very likely frequently misinterprets social stimuli." (Tr. 423). Dr. Hyatt opined that plaintiff "appears to be an individual with impaired social skills who tends to get easily upset around people." (Tr. 424). Further, plaintiff "seems to have only a tenuous grip on reality and/or his temper," as evidenced by his "history of quick mood changes and an easy anger." (*Id.*). Dr. Hyatt opined that plaintiff is moderately limited in his ability to interact appropriately with co-workers and markedly limited in his ability to (1) interact appropriately with the public, (2) interact appropriately with supervisors, and (3) respond appropriately to usual work situations and to changes in a routine work setting. (Tr. 427). Dr. Hyatt concluded that plaintiff's social functioning is markedly impaired. (*Id.*). The ALJ failed to note the consistency between Dr. Natarajan's opinion and those of the consultative psychologist, treating counselors, and treating social workers and failed to properly consider this regulatory factor in weighing the treating psychiatrist's opinion.

Thus, even if Dr. Natarajan's opinion were not entitled to controlling weight, because ALJ Kenyon failed to properly weigh the regulatory factors in assessing Dr. Natarajan's opinion, his decision to afford that opinion only limited weight is not supported by substantial evidence.

*See Rogers*, 486 F.3d at 246. Therefore, plaintiff's assignment of error is sustained as to the opinion of Dr. Natarajan. On remand, the ALJ must conduct an appropriate assessment of Dr. Natarajan's opinion before re-formulating plaintiff's RFC to properly account for the work limitations associated with the mental impairments identified in Dr. Natarajan's opinion.

Similarly, ALJ Kenyon's decision to give limited weight to Dr. Hyatt's medical assessment of plaintiff's functional abilities is without substantial support in the record. Dr. Hyatt, a consultative examiner, determined that plaintiff had the following relevant functional limitations: (1) marked impairment of short term memory; (2) mild limitation in ability to understand and remember simple instructions; (3) moderate limitation in ability to carry out simple instructions; (4) marked limitation in ability to make judgments on simple work-related decisions; (5) moderate limitation in ability to interact appropriately with co-workers; (6) marked limitation in ability to interact appropriately with supervisors and the public; (7) marked limitation in ability to respond appropriately to usual work situations and changes in a routine work setting; and (8) marked impairment of social functioning. (Tr. 423, 426-28).

ALJ Kenyon gave limited weight to Dr. Hyatt's opinion for the following reasons:

> Dr. Hyatt indicated that [plaintiff] had a GAF score of 35, which is far below [plaintiff's] demonstrated level of day-to-day functioning. [Plaintiff] alleged that he has some auditory hallucinations, but the record does not support a pattern of psychotic behavior. Dr. Hyatt noted marked level limitations on [plaintiff's] ability to interact with supervisors and the public and to adapt to change. Yet, appropriate restrictions limiting [plaintiff] to occasional contact with coworkers and supervisors, no public contact, no rapid pace work or strict production quotas, and little workplace changes should be sufficient to accommodate [plaintiff's] deficits in social functioning and stress tolerance.

(Tr. 31). ALJ Kenyon elaborated that plaintiff had "not shown the restriction of functioning associated with a GAF score between 31 and 40." (Tr. 32). ALJ Kenyon noted that plaintiff's "most recent GAF score, assessed by a licensed social worker on May 16, 2012, was 61," which "would indicate an individual with only mild symptoms or some difficulty in social, occupation,

or school functioning, who was generally functioning pretty well with some meaningful

interpersonal relationships." (*Id.*). ALJ Kenyon also noted that "the majority of [plaintiff's

GAF] scores were not provided by acceptable medical sources, which reduces their weight."

(*Id.*).

The ALJ erred in relying on the GAF scores[8] to discount Dr. Hyatt's opinion. Contrary

to the ALJ's conclusion, plaintiff's activities of daily living do not appear to be inconsistent with

Dr. Hyatt's GAF score. ALJ Kenyon asserted that Dr. Hyatt's GAF score of 35 was "far below

[plaintiff's] demonstrated level of day-to-day functioning." (Tr. 31). However, ALJ Kenyon did

not specify what "day-to-day functioning" serves as the basis for this assertion. To the extent the

ALJ relied on his earlier findings concerning plaintiff's activities of daily living, which included

waking up, taking medications, watching television, walking around the house, and "sometimes"

reheating prepared food, vacuuming, and doing laundry (*see* Tr. 23-24), the Court is unable to

discern the basis for the ALJ's conclusion. The ALJ did not provide any explanation for how

these minimal activities of daily living are inconsistent with the findings associated with a GAF

of score of 35. *See* DSM-IV at 34 (GAF score of 35 signifies "major impairment in several

areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man

avoids friends, neglects family, and is unable to work. . . .)." *Cf. Rogers*, 486 F.3d at 248

("[T]hese somewhat minimal daily functions are not comparable to typical work activities.").

Moreover, Dr. Hyatt's GAF score of 35 appears to be consistent with the treating source

evidence of plaintiff's daily functioning. As previously noted, plaintiff's treating providers

documented his significant problems with anger and depression. (*See, e.g.*, Tr. 356-57, 359).

---

[8] The Sixth Circuit has noted that a GAF score is "a subjective determination that represents the clinician's judgment of the individual's overall level of functioning." *Oliver v. Comm'r of Soc. Sec.*, 415 F. App'x 681, 684 (6th Cir. 2011) (citing *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009)). "A GAF score is thus not dispositive of anything in and of itself, but rather only significant to the extent that it elucidates an individual's underlying mental issues." *Id.* (citing *White*, 572 F.3d at 284). *See also* 65 Fed. Reg. 50746, 50764-65 (2000) ("The GAF scale . . . does not have a direct correlation to the severity requirements in our mental disorders listings.").

His relationships with family, friends, and neighbors were "very poor." (Tr. 359). Plaintiff was fired four times from his jobs for "angry outbursts" and losing his temper. (*Id.*). Dr. Natarajan noted that plaintiff's judgment was impaired because he has "episode[s] of rage with no precipitant" and "[f]requently fights in public." (Tr. 356). Thus, the record is consistent with Dr. Hyatt's assessment of a GAF of 35, indicating major impairments in work, relationships, judgment, thinking, and mood. *See* DSM-IV at 34.

In addition, the ALJ mistakenly relied on what he stated was plaintiff's "most recent GAF score [of 61], assigned by a licensed social worker on May 16, 2012" (Tr. 32) to discount the consultative examiner's opinion. The record reflects four GAF scores: an April 2012 GAF score of 49 by Social Worker Markle (Tr. 477); a May 2012 GAF score of 61 by Social Worker Markle (Tr. 474); an October 2012 GAF score of 35 by certified nurse practitioner Perry (Tr. 448); and a February 2013 GAF score of 35 by Dr. Hyatt (Tr. 423). Contrary to the ALJ's statement, plaintiff's most recent GAF score was 35, not 61, and does not support the ALJ's suggestion that plaintiff's "most recent" GAF assessment reflected an individual "who was generally functioning pretty well with some meaningful interpersonal relationships." (Tr. 32). Moreover, the ALJ's use of the GAF scores is inconsistent. On the one hand, the ALJ criticized the value of the GAF scores stating they were entitled to reduced weight because "the majority of these scores were not provided by acceptable medical sources." (Tr. 32). On the other hand, the ALJ seemingly relied on the GAF of 61 assessed by an unacceptable medical source—Social Worker Markle—to discount the later-assessed GAF score of an acceptable medical source—Dr. Hyatt. It is incongruous to criticize the GAF score of an unacceptable medical source, then rely on that same score to discredit the findings of an acceptable medical source. Thus, the ALJ's use of GAF scores to discount Dr. Hyatt's opinion is misplaced.

Additionally, ALJ Kenyon's RFC finding did not adequately account for the limitations

that Dr. Hyatt assessed. ALJ Kenyon appeared to accept Dr. Hyatt's opinion that plaintiff was

markedly limited in his ability to interact with supervisors and the public and to adapt to change,

and he purportedly accommodated such limitations by limiting plaintiff to "occasional contact

with coworkers and supervisors, no public contact, no rapid pace work or strict production

quotas, and little workplace changes." (Tr. 31). However, Dr. Hyatt also found that plaintiff had

other significant functional limitations, including marked impairment of short term memory and

marked limitation in ability to make judgments on simple work-related decisions. (*See* Tr. 423,

426-28). It is unclear from ALJ Kenyon's analysis whether his RFC assessment "limiting

[plaintiff] to occasional contact with coworkers and supervisors, no public contact, no rapid pace

work or strict production quotas, and little workplace changes" accounted for the "marked"

limitations found by Dr. Hyatt. For example, the Court is unable to discern from the ALJ's

decision why a "marked" impairment in interacting with the public translates into an RFC for

"no public contact," yet a "marked" impairment in interacting with supervisors translates into an

RFC for "occasional" contact with supervisors. Where an ALJ fails to adequately explain his

rationale for adopting particular limitations in an RFC, the matter must be remanded for further

fact finding. *See Bailey v. Comm'r of Soc. Sec.*, 173 F.3d 428, 1999 WL 96920 at *4 (6th Cir.

Feb, 2, 1999) (unpublished) ("an ALJ's decision must articulate with specificity reasons for the

findings and conclusions that he or she makes"); *Killiany v. Comm'r of Soc. Sec.*, No. 2:10-cv-

672, 2011 WL 3942211, at *9 (S.D. Ohio Aug. 3, 2011) (Report and Recommendation)

(Deavers, M.J.), *adopted,* 2011 WL 3957295 (S.D. Ohio Sept. 6, 2011) (Graham, J.) (finding that

it was "simply unclear" from ALJ's opinion whether the RFC adequately accounted for

plaintiff's mental impairments); *Bledsoe v. Comm'r of Soc. Sec.*, No. 1:09-cv-564, 2011 WL

549861, at *5 (S.D. Ohio Feb. 8, 2011) ("[T]he ALJ's failure to articulate with specificity the

reasons for her findings and conclusions 'deprives the Court of the ability to conduct any meaningful review.'") (internal citations and quotation omitted). *See also Dragon v. Comm'r of Soc. Sec.*, 470 F. App'x 454, 465 (6th Cir. 2012) (finding that ALJ's RFC assessment did not adequately account for the severity of the functional limitations the consultative examiner identified). *Cf. Wilson v. Astrue*, No. 08-cv-216, 2009 WL 1505534, at *6 (E.D. Ky. May 27, 2009) (RFC assessment limiting plaintiff to low stress, simple tasks, no interaction with the public, no more than a "seriously limited but not precluded" ability to interact with supervisors and coworkers, and no more than a "limited but satisfactory" ability to deal with work stresses was inconsistent with medical opinions that plaintiff had a marked limitation in his ability to respond appropriately to work pressures and an extreme limitation in his ability to perform routine tasks at a consistent and appropriate pace). Thus, the ALJ's decision giving limited weight to Dr. Hyatt's opinion is not supported by substantial evidence. On remand, the ALJ must conduct an appropriate assessment of Dr. Hyatt's opinion before re-formulating plaintiff's RFC to properly account for the work limitations associated with the mental impairments identified in Dr. Hyatt's opinion.

Finally, substantial evidence also does not support the ALJ's treatment of Ms. Strassell's testimony. Licensed social workers, like Ms. Strassell, are not "acceptable medical sources" and instead fall into the category of "other sources." *Id.* (citing 20 C.F.R. §§ 404.1513(d), 416.913(d)). While information from "other sources" cannot establish the existence of a medically determinable impairment, such information "may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." *Id.* Opinions from medical sources who are not "acceptable medical sources," such as licensed social workers, "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence

in the file." *Id.* at *3. It may be appropriate to give more weight to the opinion of a medical

source who is not an "acceptable medical source" if he or she has seen the individual more often

than the treating source and has provided better supporting evidence and a better explanation for

his or her opinion. *Id.* at *5. Factors to be considered in evaluating opinions from "other

sources" who have seen the claimant in a professional capacity include how long the source has

known the individual, how frequently the source has seen the individual, how consistent the

opinion of the source is with other evidence, how well the source explains the opinion, and

whether the source has a specialty or area of expertise related to the individual's impairment. *Id.*

at *4. *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007).  Not every

factor will apply in every case. *Id.* at *5. The ALJ "should explain the weight given to opinions

from these 'other sources,' or otherwise ensure that the discussion of the evidence in the

determination or decision allows a claimant or subsequent reviewer to follow the [ALJ's]

reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-03p at

*6.

 In giving "little weight" to Ms. Strassell's opinion, ALJ Kenyon found that she "is not an

acceptable medical source and appears to be relying largely on [plaintiff's] own reports about his

assault, subsequent injuries, and rehabilitation." (Tr. 32). ALJ Kenyon also stated that the

objective medical evidence does not support Ms. Strassell's "assertions that [plaintiff] has a

marked inability to complete a normal workday without interruptions from his mental disorder

and is unable to engage in work activity." (*Id.*).

 Plaintiff's assignment of error is sustained as to Ms. Strassell's opinion. As described

above, her opinion is consistent with the opinions of Dr. Natarajan, Dr. Hyatt, and other

treatment providers. Although Ms. Strassell is not an "acceptable medical source," that is not a

valid reason to reject her opinion, which is not being offered to establish the existence of a

medically determinable impairment. *See* SSR 06-03p at *2. Instead, given Ms. Strassell's consistent contact with plaintiff as his case worker, her opinion "may be based on special knowledge of [plaintiff] and may provide insight into the severity of the impairment(s) and how it affects [plaintiff's] ability to function." *Id.* On remand, the ALJ should re-assess Ms. Strassell's opinions under the factors identified for evaluating opinions from "other sources" who have seen a claimant in a professional capacity. *See id.* at *4. *See also Cruse*, 502 F.3d at 541.

### 2. The Court need not reach plaintiff's assignments of error concerning ALJ Kenyon's credibility determination and RFC assessment.

It is not necessary to address plaintiff's remaining assignments of error. The ALJ's reconsideration of the opinions of Dr. Natarajan, Dr. Hyatt, and Ms. Strassell may impact the remainder of the ALJ's analysis, including the RFC assessment and the assessment of the credibility of plaintiff and his mother. *See Trent v. Astrue*, No. 1:09-cv-2680, 2011 WL 841538, at *7 (N.D. Ohio Mar. 8, 2011). In any event, even if these assignments of error have merit, the result would be the same, i.e., remand for further proceedings and not outright reversal for benefits. *Mays v. Comm'r of Soc. Sec.*, No. 1:14-cv-647, 2015 WL 4755203, at *13 (S.D. Ohio Aug. 11, 2015) (Report and Recommendation) (Litkovitz, M.J.), *adopted*, 2015 WL 5162479 (S.D. Ohio Sept. 3, 2015) (Dlott, J.).

## III. This matter should be reversed and remanded for further proceedings.

In determining whether this matter should be reversed outright for an award of benefits or remanded for further proceedings, the Court notes that all essential factual issues have not been resolved in this matter. *Faucher v. Sec'y of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). On remand, the ALJ should (1) reassess plaintiff's RFC, giving appropriate weight to the opinions of Dr. Natarajan, Dr. Hyatt, and Ms. Strassell; (2) reassess plaintiff's credibility and that of his mother in light of a proper re-evaluation of the opinions of Dr. Natarajan, Dr. Hyatt, and Ms.

Strassell; and (3) pose an appropriate hypothetical or hypotheticals to a VE once the ALJ has completed an assessment of plaintiff's RFC that properly accounts for the opinions of Dr. Natarajan, Dr. Hyatt, and Ms. Strassell.

**IT IS THEREFORE ORDERED THAT**:

The decision of the Commissioner is **REVERSED** and **REMANDED** for further proceedings consistent with this opinion.

Date: _3/21/16_

Karen L. Litkovitz
United States Magistrate Judge